By the Court. Bosworth, J.
The defendant insists that the proceedings under the attachment are void on two grounds. 1. On the ground that Justice Sandford was not authorized by law to issue an attachment, at the time the one in question was issued. 2. On the ground that it did not appear by the papers on which it was issued, that all the applicants resided in the *546 State of New York; and that it is confessed by the pleadings that, in point of fact, one of them never did reside in this State.
The statute establishing this court was passed on the 31st of March, 1828. ( 3 R. S., 2d ed. 261.)
The 23d section provides, among other things, that, “ the said justices, and each of them, shall moreover be, and they are hereby authorized to perform all the duties which the justices of the Supreme Court, out of term, are authorized to do and perform, by any statute of this State : ” P. 264.
The defendant’s counsel insists that this section speaks as of the time the act of 1828 took effect, and that if a statute should subsequently be passed, authorizing the justices of the Supreme Court to do acts, out of term, which they had no previous authority to perform, the justices of this court would not be authorized, by any fair construction of this section, to perform such acts.
Even if this be the true construction of the section, it would follow, that any justice of this court, by force of § 23 of the act of 1828, may do any act which a justice of the Supreme Court could perform, out of term, when that act took effect, unless the authority conferred by it has been subsequently restricted or abrogated.
When the act of 1828 took' effect, a justice of the Supreme Court was authorized to issue attachments against non-resident debtors. (1 R. L. of 1813, p. 157, § 1.)
Power and authority to grant attachments, in such cases, was therefore conferred on a justice of this court at the time of its creation.
The existing statute, in relation to attachments in such cases, was passed on the 4th of December, 1827, and took effect on the 1st of January, 1830. It is a re-enactment of the pre-existing law on the same subject, with some modifications and additions. (2 R. S., p. 3.)
By the revised act, the justices of the Supreme Court and the chancellor, were relieved from the duty of entertaining applications for such attachments. (2 R. S., p. 35, § 1; 3 R. S., 2d ed., p. 621.)
Thé act of 1801, found in 1 R. L., p. 157, was repealed from and after the 31st of December, 1829, as were all acts amend *547 ing the same, or relating to the subject matter thereof. (3 R. S., p. 151.)
A justice of the Supreme Court, from and after the 1st of January, 1830, until the 1st of July, 1847, could not issue such an attachment. (Laws of 1847, vol. 1, p. 323, § 16, and p. 343, §76.)
The section of the revised statutes designating the officers who may grant such attachments, does not include within the number “ a justice of the Superior Court,” by that title or description. “ Supreme Court Commissioners ” are among the designated officers. A justice of the Supreme Court is not of the number. On and after the 1st of January, 1830, there was not any statute of this State existing which authorized any justice of that court to perform such an act. Before that day, all preexisting statutes, relating to the issuing of attachments in such cases, had ceased to exist. The act of 1801 (1 R. L., p. 157) being repealed, a justice of this court could not issue an attachment under it, and the R. S. having taken effect on the 1st of January, 1830, and containing in itself all the statutory law, then relating to the subject matter thereof (3 R. S., p. 151), a justice of this court, as such, could not issue an attachment under the revised statutes, for the reason that no such officer is named in § 1, p. 35 of. 2 R. S.
By another section of the revised statutes, the justices of this' court were declared to be, by virtue of their office, “ Supreme Court Commissioners,” and were “ required to perform all the duties herein conferred on such commissioners;” subject to all the provisions of the title, in which that section is found, except that they were prohibited from making any order in any cause or matter pending in the Supreme Court. (2 R. S., p. 281, § 33.)
The grant of power made by this section is in the precise phraseology of that, making every recorder of a city, and every judge of a county court of the degree of counsellor in the Supreme Court, by virtue of their respective offices, Supreme Court commissioners; except that in the latter, the concluding clause omits the words, “ on such commissioners.” (Id. § 32.)
There is nothing in that title conferring authority on a *548 “ Supreme Court Commissioner,” to issue such an attachment. It is not by force of any grant of power found in that title, that a Supreme Court commissioner could claim any such power. If that officer had not been included among those enumerated in 2 R. S., p. 35, he would have had no authority to issue such an attachment. (2 R. S., p. 280, § 19.)
But recorders of cities, and judges of county courts, though made, by virtue of their offices, by § 32 of 2d R. S. 281, Supreme Court commissioners, are specially named in the act which enumerates the officers, who may issue such attachments.
It is somewhat singular that the latter section should, in addition to specifically designating Supreme Court commissioners, name every officer who, by § 32, was then ex officio a Supreme Court commissioner, except a justice of the Superior Court of the city of New York.
It may be urged, that as recorders of cities, and as judges of a county court, of the degree of counsellor at law, were expressly authorized, as such, to grant attachments, they were so authorized, not as Supreme Court commissioners, but as recorders and county judges. This would indicate that the words, “ Supreme Court commissioners,” as used in that section, were meant to designate only that class of persons who were nominated and appointed as such by the Governor, with the consent of the Senate. (1 R. S., 96 & 107, § 15.)
I think it quite evident, that as all laws authorizing the issuing of attachments against non-resident debtors, in force when this court was created, ceased with the 31st of December, 1829, to exist, and with them every statute authorizing a justice of the Supreme Court to grant it; the only authority of a justice of this court to entertain an application, after the 31st of December, 1829, was derived from the act, making them ex officio Supreme Court commissioners, and the section allowing Supreme Court commissioners to grant such attachments. This construction makes it necessary to assume, in order to affirm the existence of the power, that the words Supreme Court commissioners, as used in that section, include as well officers who were ex officio such, as those appointed such by the Governor, and which construction is not necessary to confer the authority on any other ex officio Supreme' Court commissioner *549 than justices of this court. Such a construction should be given, if maintainable, for the reasons, that such is the practical construction the section has received from January, 1830, to July, 1817. The consequences of holding all proceedings coram nonjudice, and void, which have been had with the fullest confidence that such was the true construction, would be so serious, that a new construction, which should produce them, should not be given, unless absolutely unavoidable.
Assuming, then, that a justice of this court, on and after the first of January, 1830, by virtue of being ex officio a Supreme Court commissioner, had the authority, the question remains, Has the authority been abrogated, or does it yet continue ?
Section 8, of Art. 11, of the present constitution, abolished the office of “ Supreme Court Commissioners” from and after the 1st of July, 1817. (Laws of 1817, vol. ii., p. 111.) From and after the 1st of July, 1817, therefore, a justice of this court, in the absence of all legislation upon the subject, could have no authority to do any act, which he could previously perform only and solely by reason of his being ex officio such a commissioner. Ceasing to be such an officer, all the authority that he could exercise only by reason of being such an officer, would be abrogated by the extinction of the office. But up to the 1st of July, 1817, by force of the act creating him ex officio a Supreme Court commissioner, and of the act authorizing such a commissioner to issue such attachments, he had power to grant them.
On the 12th of May, 1817, an act was passed to elect the justices of this court. The seventh section provides that “The justices of the Superior Court, whose election is provided for by this act, shall have and possess the same powers, and perform the same duties as the justices of that court now have, and possess, and perform.”—'Laws of 1817, p. 281, § 1.
When that act was passed, they had and possessed the power to issue such an attachment. We think the legislature did not intend to exonerate them from the performance of that duty. That this section was designed to confer, by its comprehensive phraseology, on the justices to be elected, all the powers which those then in office exercised and possessed, whether such powers *550 related to statutory proceedings, or to actions instituted in the court of which they were members.
It is true that § 76 of the Judiciary Act required all proceedings of this kind, pending before any Supreme Court commissioner, on the first Monday of July, 1847, to be transferred to one of several officers named in it. But the transfer, by that section, might be made to an “ officer now [then] authorized to hear and determine such suit or proceeding, or who shall continue in office after the day last aforesaid.”—Laws of 1847, p. 343.
A justice of this court was such an officer. He was to continue in office until the 1st of January, 1848. (Laws of 1847, p. 280, § 3.) He had such power and authority at the time the Judiciary Act was passed, viz. May 12,1847. (Id., p. 319; id., p. 343, § 76.) He was to remain invested with the same power after the 1st of January, 1848, if the construction which we have given to § 7 of the act of May 12, 1847, be correct. (Id., p. 281, § 7.) We think, therefore, an attachment could properly have been issued by a justice of this court at the time the one in question was granted.
Was there a defect of jurisdiction, because it did not appear, by the papers on which the attachment issued, that all the joint creditors applying for it resided in the State of New York?
The application does not state where the contract was made, on which the alleged indebtedness arose. It describes all the applicants as being “ of the city of New York,” and concludes by stating that “ your applicants, or some of them, reside in the state of New York,” and that the persons proceeded against “ reside at Vera Cruz and Mexico.”
The affidavits of the two witnesses testify to the facts, that the persons indebted are residents of Vera Cruz, or elsewhere, in the republic of Mexico, and that the “ applicants carry on business in the city of New York, and one or more of them is a resident of the state of New York.” It does not appear, by the papers, where the contract was made, nor where the debtor resided at the time it was made.
The complaint describes the contract as having been made in Mexico and that F. F. Eenard, one of the applicants, did *551 not reside in the state of New York when the contract was made, nor at any time thereafter, nor at the time the attachment was applied for.
The reply asserts, that the attaching creditors were partners, were doing business, as such, in the state of New York, when the contract was made; that some of them were then citizens and residents, and were so at the time of applying for the attachment ; and insists that the non-residence of one member of the firm did not render the attachment void.
It was decided, in the matter of Brown (21 Wend. 316), that the only fact to which the two witnesses need testify, is the non-residence of the debtor, and that they need not testify to the residence of the creditor, nor anything in relation to the contract. Brohson, J., said, “ The fact that there is such a debt, and such a creditor as the statute specifies, may be established by other evidence.”—P. 319. In that case, the application stated that the demand arose upon contract made within this state. The evidence of the parties’ own oaths was furnished, that such a contract had been made as warranted the attachment, no matter where the creditors resided. In the case before us, for aught that appears, the contract may have been made within this state, but the fact is not affirmatively stated.
In Staples v. Fairchild (3 Coms. 41), while the court held that the only fact, required to be proved by the two witnesses, was that of the non-residence of the debtor, yet, it also held that the proceedings were void, because the application did not affirmatively state, either that the contract was made within this state, or that the creditor resided within it. As the papers in question do not state that the contract was made in this state, it is indispensable to the acquisition of jurisdiction, that they should, in order to satisfy the statute, in some form allege that the creditor resided in this state. The attaching creditors constituted a firm. Its place of business was within this state ; and the members of the firm actually controlling the business were citizens and residents. So much is shown by the papers. Is this sufficient to give jurisdiction ?
2 R. S. 36, § 8, provides that, “ whenever partners are creditors of any debtor, any petition and affidavit required by the *552 preceding articles, of creditors, may be made and signed by either of the partners.”
§ 9 requires of creditors, residing out of this state, but within the United States, further evidence of the contract on which their demand arises, than is required of resident creditors.— Vide § 11 id.
Suppose that P. F. Renard had resided in Connecticut, or any other of the United States, instead of being a resident of Paris, would any other evidence in relation to the contract have been required, than such as is required, when all reside within the same state ?
Does § 9 (2 R. S., p. 36) require that the creditors authorized by it to “ unite in any petition” should all reside “ out of the (State,” in case they constitute a firm? If so, and if the construction contended for by defendant’s counsel be correct, then it follows that if a partnership is a creditor, though all its members reside “ within the U. States,” yet, if some of the members reside within, and some out of this state, they cannot unite in a petition with a resident creditor, under § 3, 2 R. S., p. 3, for the reason that all the members do not reside out of the state ; jmd they cannot apply alone, for the reason, that all do not reside within the state. On such a construction, the rights of a firm, all of whose members reside out of the state, would be guperior to those of one transacting business in the state, under fire sole control of resident partners, but having one of the firm residing out of the state.
Does not a case fall both within the letter and the spirit of the act, which presents a firm, as the petitioning creditors, whose place of business, and the property connected with it, are within the state, under the actual control and management of citizens and residents, although one or more of the members may reside out of the state ? Or must every member be a resident creditor, in all cases where the contract was not made within the state ?
Those of the applicants, who reside within this state, were creditors of the persons proceeded against, and were creditors by reason of the demand on which the attachment issued. One of the applicants, who resided out of the state, was also a creditor, by reason of being a member of the firm with which *553 the contract was made. But a partnership being the creditor, its place of business being here, and its business being controlled and managed by the creditors who resided here, and who applied for the attachment, we are of the opinion that the proceedings should not be held void, merely because one of the partners resided out of the state. That the act should be liberally construed in this respect, and proceedings under it not be held void, by the adoption of that limited construction for which the defendant contends.
The other questions that were discussed by the counsel, we think, are free from difficulty.
We entirely agree with the judge who tried the cause, that the evidence clearly shows that Ramsdell had no authority to make any purchase or shipment of hides on account of the plaintiffs, or to draw the bills which he drew upon them; and that no facts or circumstances were proved, from which the jury could legally infer that he possessed such authority, or that the plaintiffs had, in any manner, adopted or ratified his unauthorized acts. The plaintiffs were, therefore, entitled to a verdict for the whole balance of the moneys which Hargous & Co. had collected and received on their account; but we are all of opinion that the judge erred in directing the jury to include in their verdict the sum of $802T678o, which was the balance of the advances made by the plaintiffs, in New York, upon the shipment of iron. The demand of the plaintiffs, as sworn to in their application for the attachment, was limited to the proceeds of the merchandise which had been placed in the hands of Hargous & Co., at Vera Cruz, for sale. The sum advanced by the plaintiffs in New York assuredly constituted no part of these proceeds, and, therefore, constituted no part of the demand, which the defendant, by the condition of his bond, if established, was bound to satisfy.
The plaintiffs must consent that this sum of $802.67 shall be deducted from the verdict, or there must be a new trial. If they make the deduction, they will be entitled to judgment upon the verdict, as reduced, with costs.*

 The plaintiffs consented to the deduction, and the amount of the verdict was adjusted by the counsel of the parties.